**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE PRUDENTIAL INSURANCE,<br>CO. OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  17 C 8732 |
| v. | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| PATICIA NEWMAN and<br>JAMES HERST | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On December 4, 2017, Plaintiff Prudential Insurance Company of America ("Prudential") brought this diversity action against defendants Patricia Newman and James Herst seeking interpleader pursuant to Federal Rule of Civil Procedure 22.  (Dckt. # 1).  Mr. Herst died after this motion was filed and the executor of Herst's estate has been substituted as the party defendant in his place.  (Dckt. ## 61, 63).[1]  Prudential's complaint alleges that Prudential issued a $300,000 individual life insurance policy to Steve Newman (Patricia Newman's late husband) on September 15, 2015.  (Dckt. # 1, at 2).  Steve Newman died on June 10, 2017,[2] and Prudential received competing claims for the insurance policy benefits from Ms. Newman and Herst. Prudential then brought this interpleader action to determine the proper allocation of the policy's benefits.

---

[1] For the sake of simplicity, the Court will refer to the executor of James Herst's estate as the "Estate" and to James Herst himself as "Herst."

[2] Since Steve Newman is the primary figure in the underlying events, the Court will refer to him as "Newman" and to defendant Patricia Newman as "Ms. Newman."

This case was originally assigned to District Judge Jorge Alonso. On April 20, 2018, the parties consented to proceed before former Magistrate Judge Michael Mason on all matters, including an entry of final judgment. (Dckt. # 31); 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). Prudential sought leave to deposit the interpleader funds with the Clerk of Court and to be dismissed from the case. (Dckt. # 33). On May 30, 2018, Judge Mason granted the motion, dismissed Prudential with prejudice, and retained jurisdiction over the Estate's and Ms. Newman's claims to the insurance proceeds.[3] (Dckt. #42). On June 4, 2018, the insurance proceeds plus accumulated interest ($304,338.67) were deposited with the Clerk of the Court. The case was then reassigned to this Court on February 1, 2019.

Before the Court now is the Estate's motion for partial summary judgment, in which the Estate asserts that it is entitled to at least $267,541 of the interpleader funds. The Estate seeks to recover for the debts that it claims that Newman and a company known as Performance Source, Inc. owed to Herst at the time Newman died. For the reasons discussed below, the Estate's motion is granted in part and denied in part.

## I. LEGAL STANDARD FOR CONSIDERATION OF SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Issues of fact are material if they are outcome determinative. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004). The moving party bears

---

[3] The Court notes that although Prudential's dismissal from this action eliminated the diversity that was present at the time of filing, it is well-established that courts retain jurisdiction over Rule 22 actions when a stakeholder's dismissal leaves only non-diverse parties such as Ms. Newman and Herst. *See, e.g.*, *State Farm Life Ins. Co. v. Jefferson*, No. CV 116-085, 2017 WL 2198179 at *3 (S.D.Ga. May 18, 2017); *Standard Ins. Co. v. Nelson*, No. C07-0140RSM, 2007 WL 1453099, at *1 (W.D.Wash. May 17, 2007).

the burden of showing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met that burden, the nonmoving party cannot rely on mere conclusions and allegations to create factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Evidence considered on a summary judgment motion "need not be admissible in form, but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." *Wheatley v. Factory Card & Party Outlet,* 826 F.3d 412, 420 (7th Cir. 2016). Furthermore, courts do not weigh the evidence or resolve conflicts in the record in a summary judgment proceeding; instead, they review the evidence presented in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013). Summary judgment is only granted "if no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (internal quotes and citation omitted). Finally, where - - as here - - a court's jurisdiction is based on the diversity statute, state law controls the substantive issues. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).

Parties briefing summary judgment motions in this District must also comply with Local Rule 56.1 and this Court is entitled to require strict compliance with its terms. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015). Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts."

N.D. Ill. R. 56.1(a).  Local Rule 56.1 statements must be limited to material facts that are "supported by specific references to the record" and "although the evidence supporting a factual contention need not be admissible itself, it must represent admissible evidence." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000).  Conversely, it is inappropriate to include non-factual matters such as speculation, legal arguments, and legal conclusions within Local Rule 56.1 statements.  *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); *Teerling v. Fleetwood Motor Homes of Ind., Inc*., No. 99 C 5926, 2001 WL 641337, at *1 (N.D. Ill. June 4, 2011). (stating that a Rule 56.1 claim that a party "executed a release" is a legal conclusion that may not be included in a statement of fact). [4]

"The moving party has the responsibility of asserting *all* facts relied upon in its opening statement of facts under Local Rule 56.1(a)."  *Blackhawk Molding Co., Inc. v. Portola Packaging, Inc.,* 422 F.Supp.2d 948, 952 (N.D.Ill. 2006) (emphasis added) (internal quotation marks omitted).  Consequently, "Local Rule 56.1 does not contemplate a statement of additional facts from the movant."  *Id.*; *Carter v. Finley Hospital,* No. 01-C-50468, 2003 WL 22287392 at *1 (N.D.Ill. Sept. 30, 2003) (striking movant's statement of additional material facts).  For this reason, the Court will strike the Estate's statement of additional material facts (Dckt. # 66), and it will not consider the facts asserted therein when determining whether the Estate is entitled to summary judgment.

The party opposing summary judgment is then obligated to file "a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of disagreement, specific references to the affidavits,

---

[4] Accordingly, this Court will disregard the Estate's assertions in its Rule 56.1 statement that PSI and Newman "defaulted" on their payment obligations under the parties' contracts.  (Dckt. # 19, at 2, 4). Whether a "default" occurred in this case is a legal conclusion that requires an interpretation of the parties' contractual agreements.  *See* Section III(C)(1), *infra.*

parts of the record, and other supporting materials relied upon." N.D. Ill. R. 56.1(b)(3)(B)). A moving party's facts are deemed admitted for the purpose of a summary judgment motion "unless controverted by the statement of the opposing party." N.D. Ill. R. 56.1(b)(3)(C). The nonmoving party may also submit a statement of additional facts that complies with the standards that apply to the moving party's fact submission. *Id*; *see also De v. City of Chicago*, 912 F. Supp.2d 709, 711-12 (N.D.Ill. 2012). If the moving party disputes the additional facts of the non-movant, it must contest them in a reply submission or the non-movant's additional facts will be deemed admitted. N.D. Ill. R. 56.1(b)(3)(C). In this case, the Estate has failed to respond to Ms. Newman's statement of additional facts and the facts within her statement - - to the extent that they are properly supported - - are deemed admitted for purposes this motion. *See, e.g., Matter of Kothe,* No. 15-CV-8876, 2017 WL 4264901 at *2 (N.D.Ill. Sept. 26, 2017) (deeming non-movant's statement of additional facts admitted where the movant failed to respond to the non-movant's statement).

## II. FACTUAL RECORD

Performance Source Inc. ("PSI") is an Illinois-based commercial debt management company that James Herst founded in 1963. (Dckt. #19, at 1).[5] Herst hired Newman as a PSI employee in 2003. (Dckt. #19, at 2). On October 1, 2006, Herst and Newman agreed to transfer

---

[5] For purposes of precision and clarity, the Court will cite to references within the Estate's Statement of Facts by referring to the page within Dckt. #19 where the reference appears. The Court will likewise cite to Ms. Newman's Responses to the Estate's Statement of Facts and her own Statement of Additional Facts (Dckt. #64-1) in the same manner. The Estate supports its Statement of Facts with Herst's affidavit (Dckt. #23), to which ten exhibits have been attached. These ten exhibits appear in successive pages of Dckt. #23. Ms. Newman supports her Rule 56.1 submissions with Herst's entire deposition transcript (Dckt. #64-2), including eight exhibits that were produced during Herst's July 19, 2018 deposition. These eight exhibits appear in successive pages of Dckt. #64-2. The Court has considered Herst's deposition testimony where pertinent even if the particular excerpt was not cited by the parties. *See Torry v. City of Chicago,* 932 F.3d 579, 584 (7th Cir. 2019), *quoting* Fed.R.Civ.P. 56(c)(3) ("In adjudicating a motion for summary judgment, '[a] court need consider only the cited materials, but it may consider other materials in the record.'").

the ownership of PSI to Newman by means of four interrelated agreements namely: (1) the Stock Purchase Agreement; (2) Non-Negotiable Secured Installment Note; (3) the Corporate Security Agreement; and (4) the Purchaser's Security Agreement. These documents (collectively referenced as the "2006 Contract") were entered into effective October 1, 2006, are governed by Illinois law, and constituted "the entire Agreement between the parties." (Dckt. # 23, at Exs. 1, 2, 3; Dckt. #64-2, at 70, 84).

## A.     The 2006 Contract

### i.     The Stock Purchase Agreement

The Stock Purchase Agreement ("SPA") was executed between by three parties: (1) Herst as seller, both individually and as trustee of his living trust; (2) Newman as the purchaser, and (3) PSI (through Herst as its corporate president). (Dckt. #23, at 16). Herst agreed to sell Newman one share of PSI's stock for $1,000. (Dckt. #23, at 1). Newman paid Herst $1,000 for the remaining share of PSI on the date the transaction closed (Dckt. #64-2, at 11). PSI agreed to redeem the remaining 99 shares of Herst's stock in the corporation, upon which Herst was to transfer the redeemed shares to PSI for a purchase price of $335,000. [6] (Dckt. #23, at 4). Herst was also to be paid $25,000 for a covenant not to compete against PSI, bringing the total purchase price to $360,000. (*Id.*). Under the terms of the SPA, PSI was solely responsible for the payment of this $360,000 "redemption price." (*Id.*; Dckt. #64-1, at 5). Herst executed the SPA individually

---

[6] Despite Herst's sworn testimony that he owned all 100 shares of PSI at the time of the sale, Ms. Newman attempts to raise a factual dispute on this point, citing evidence that Herst - - who had previously given one PSI share to his late wife (who died prior to the 2006 sale) - - does not recall doing anything to redeem the share from her estate or transferring this share back to PSI. (Dckt. #64-1, at 1-2). There is no disputed issue of fact, however, because the evidence that Ms. Newman cites to does not squarely dispute Herst's testimony that he owned all 100 shares of the PSI stock. Herst could have acquired ownership of this share of stock by virtue of his late wife's will or by operation of law through intestacy if she had no will even if he took no steps to redeem the share from her estate or to transfer it back to PSI.

and as sole trustee of his living trust and as the President of PSI. (Dckt. #23, at 16). Newman executed the SPA in his individual capacity. (*Id.*).

Attached to the SPA were five exhibits that were considered part of the SPA itself. (Dckt. #23, at 17.) These exhibits included a Non-Negotiable Secured Installment Note signed by PSI, a Corporation's Security Agreement signed by PSI and Herst, and a Purchaser's Security Agreement signed by Herst and Newman. (*Id.*).

### ii. The Non-Negotiable Secured Installment Note

To cover the payment of the purchase price of the 99 PSI shares of stock and the covenant not to compete, PSI issued the Non-Negotiable Secured Installment Note ("Note") of $360,000 to Herst (the payee). (Dckt. #23, at 1, 18-21). The Note obligated PSI to make 40 quarterly installment payments to Herst in the amount of $9,000 each quarter, or a lesser amount if other criteria that are not relevant to this proceeding were met, starting on May 1, 2007. (Dckt. #23, at 18-19). Each payment was to include interest on the outstanding principal balance starting at a rate 4.93 percent per annum. (Dckt. #23, at 18).

The Note also defined Herst's rights in the event that PSI defaulted on its payments. In particular, the Note provided that:

> At the election of the Payee [Herst] or legal holder hereof, it is expressly understood and agreed that if default be made in the payment of any of the said installments of principal above mentioned or interest thereon, when due, same shall, at the option of the legal holder hereof, become immediately due and payable, without further notice thereof, and shall be collectible immediately or at any time after said such default, anything herein before contained to the contrary notwithstanding. Maker [PSI] shall not be in default unless Maker [PSI] shall have failed to cure said default within thirty (30) days from the date of receipt of written notice from the Payee [Herst] or the legal holder hereof, advising Maker that a principal payment due hereunder and/or interest due hereunder has not been paid.

(Dckt. #23, at 20).  Herst was required to provide written notice by registered or certified mail to

PSI at its business address (to the attention of Newman) and to its attorney.  (Dckt. #23, at 19-20).

The Note further provides that:

> the obligations under this Note are secured by that certain Corporation's Security
> Agreement and Purchaser's Security Agreement (as such terms are defined in the
> Agreement, collectively referred to herein as the 'Security Agreements') copies of
> which are attached hereto and marked for identification as **Exhibit B** and **Exhibit
> C**, respectively; it being specifically agreed that Pay[ee][7] shall look only to the
> pledged Collateral (such as term is defined in the Security Agreements) for any
> payment and/or performance due under this Note.

(Dckt #23, at 20) (emphasis in original).  Newman signed the Note in the capacity of President of

PSI.  (Dckt. #23, at 21).

### iii.  The Corporation's Security Agreement

Herst and PSI entered in the Corporation's Security Agreement ("CSA"), under which the

obligations of PSI (the "debtor") under the SPA and the Note were secured by "collateral" (namely,

the 99 shares of PSI stock that PSI redeemed from Herst).  (Dckt. #23, at 22; Dckt. #64-2, at 79).

In particular, the CSA provided that:

> Debtor's [PSI's] failure to pay any quarterly installment of the Note within thirty (30) days
> after Debtor's receipt of written notice from Secured Party [Herst] that such installment is
> past due and provided Debtor does not reasonably dispute such notice within thirty (30)
> days after Debtor's receipt of written notice from Secured Party of such failure shall
> constitute a Default under this Corporation's Security Agreement. In the event any such
> Default is not cured within thirty (30) days of Debtor's receipt of such written notice, then
> interest shall accrue on such unpaid quarterly installment at an annual rate of interest of
> eight percent (8%) per annum, until such quarterly installment has been satisfied.  Further,
> if at any time Debtor is in Default for failing to make three (3) quarterly installments and
> so long as those three (3) quarterly installments remain due and unpaid then, and only in

---

[7] The Note's text states "Payor" at this point.  However, the Court finds that the Note was intended to
state "Payee" because the term "Payor" in neither used nor defined anywhere else within the Note and the
identified "Payee" (namely, Herst) is the only party who would be looking to the pledged collateral for
payment and/or performance under the Note.  *See Hartford Fire Ins. Co. v. St. Paul Surplus Lines,
Co.,* 280 F.3d 744, 747 (7th Cir. 2002) ("Interpreting contracts to make economic sense is a method of
contract interpretation that we have commended"); *Employers Ins. of Wausau v. Titan Int'l, Inc.,* 400 F.3d
486, 489 (7th Cir. 2005) ("Nonsensical, or as here logically impossible, interpretations of statutes, rules,
and contracts are unacceptable").

such event, Secured Party has the right to declare the then balance of the Note immediately due and payable . . . .

(Dckt. #23, at 23). The CSA further provided that Herst was required to deliver written notice of past due quarterly installment payments to PSI at its business address (to the attention of Newman) and to its attorney by one of the following means: (1) in person to someone entitled to receive notice; (2) by certified or registered mail; (3) by an overnight courier service; or (4) by fax. (Dckt. #23, at 24).

Finally, the CSA imposed certain obligations on PSI with respect to securing a life insurance policy on Newman. (Dckt. #64-2, at 80). In particular, the PSI provided:

> Newman's Policy. Un[til] the Note has been satisfied, Debtor (PSI) will use commercially reasonable efforts to maintain a life insurance policy on the life of Newman in an amount at least equal to the outstanding principal amount of the Note ("Newman Policy"). The Newman Policy will provide that in the event of Newman's death, proceeds of the Newman Policy shall first be paid to Secured Party (Herst) to the extent of the then outstanding principal amount of the Note. The parties acknowledge that the Newman Policy may be in an amount in excess of the amount due to Secured Party. Secured Party shall have no right, title and/or interest in and to any proceeds payable under the Newman Policy in excess of the then principal amount due to Secured Party under the Note. To the extent the Newman Policy is in existence while the Note remains unpaid, once annually, Debtor shall provide notice to Secured Party that the Newman Policy is in effect and that the premiums due thereon have been satisfied as of such date.

(Dckt. #64-2, at 80).

Herst did not recall at his deposition whether PSI had obtained a life insurance policy for Newman as of the time the parties executed the SPA. (Dckt. #64-2, at 18). Herst did become aware that a life insurance policy had been taken out on Newman's life shortly after the 2006 Contract was executed. (Dckt. 64-2, at 30). Herst further testified that two additional successive life insurance policies were taken out on Newman's life after the execution of the 2006 Contract and that the third policy lapsed in 2014 prior to the parties' execution of the 2014 Agreement due to a failure to make the premium payments. (Dckt. 64-2, at 30-31).

iv.     **The Purchaser's Security Agreement**

Herst (the "secured party") and Newman (the "debtor") entered in the Purchaser's Security Agreement ("PSA"), under which the obligations of PSI (the "corporation") under the SPA and the Note were secured by "collateral" consisting of the "purchaser's stock" (namely, the 1 share of PSI stock that Newman purchased from Herst). (Dckt. #64-2, at 84). The PSA further provides that Newman would become "the only owner of Stock (namely, the 100 shares of PSI stock) that is then issued" as of the closing date. (Dckt. #64-2, at 84). The PSA had a default provision that is materially identical to the default provision within the CSA with the exception that the PSA required Herst to provide Newman and his attorney with written notice that one or more of PSI's quarterly installment payments were past due. (Dckt. #64-2, at 85). The means by which Herst was to deliver written notice to Newman and his attorney are the same as are stated in the CSA. (Dckt. #64-2, at 86).

B.     **PSI's payments to Herst prior to October 2014**

Starting on May 1, 2007, and on a quarterly basis thereafter, the Note provided that PSI would pay Herst a base of $9,000, until the $360,000 - - with contractually mandated additions - - was paid in full. (Dckt. #23, at 18). The record contains no detailed evidence of the payments that PSI made between 2006 and late 2013. A payment ledger sent to Herst by Newman in or around August 2014[8] does show that PSI owed Herst $276,750 as of January 1, 2011 and that PSI owed

---

[8] Ms. Newman asserts that this Court should not consider the August 2014 payment ledger on the grounds that it is not properly authenticated and lacks proper foundation. While Ms. Newman is correct that documents submitted in support of summary judgment must be properly authenticated and admissible, *see Smith v. City of Chicago,* 242 F.3d 737, 741 (7th Cir. 2001), the Court finds that Herst has made a prima facie showing that the August 2014 payment ledger is genuine and authentic by providing his sworn affidavit identifying the author of the document (Newman), its time of receipt by Herst, and the meanings of its contents. (Dckt. #23, at 2); Fed.R.Evid. 901(b)(1); *United States v. Fluker,* 698 F.3d 988, 999 (7th Cir. 2012) ("Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury").

Herst $249,377.49 as of December 31, 2013 (Dckt. #23, at 2, 27).[9]  The August 2014 payment ledger further establishes that PSI made eight payments of various amounts to Herst between January and August 2014 that totaled $5,600 (Dckt. #23, at 27).   As such, PSI fell far short in making the $9,000 in payments that was due for each quarter in 2014.  (*Id*.).  Despite this, Herst did not deliver written notice to PSI and its attorney of PSI's default in the making of any of the installment payments required by the Note.  (Dckt. #64-1, at 6).   Herst further admitted in his deposition that he did not formally enforce any defaults of the 2006 Contract between 2006 and 2014.  (Dckt. #64-2, at 27).  As of August 18, 2014, PSI owed Herst a balance of $243,777.49. (Dckt. #23, at 27).

## C.     The 2014 Agreement

On October 3, 2014, Herst and Newman signed a new agreement that was titled "2014 Agreement for Variation of purchase price of 9/30/2006 AGREEMENT re sale of Performance Source Inc. (PSI) from James Herst (JH) to Steve Newman (SN)" (hereafter, the "2014 Agreement"). (Dckt. #23, at 2, 28).  The purpose of the 2014 Agreement was to enable Newman to better operate PSI by reducing the monthly payments to Herst and extending the term during which payments would be made.  (Dckt. #64-2, at 28-29).  Herst agreed to accommodate Newman because he wanted the continuation of income and he believed that more consistent payments would serve to meet his financial needs.  (Dckt. #64-2, at 29).  Herst and Newman signed the 2014 Agreement in their individual capacities.  (Dckt. #23, at 28).

The 2014 Agreement altered the purchase price and payment terms that were part of the Note.  Instead of PSI owing $9,000 each quarter to Herst under the Note, the 2014 Agreement provided that:

---

[9] Herst made additional advances to PSI in the amount of $19,500 between mid-October and Mid-December 2007. (Dckt. #23, at 3).  PSI had the obligation to repay these advances. (Dckt. #23, at 37).

> [Newman] is to remit to [Herst] monthly the sum of $1500 (Fifteen Hundred Dollars) starting on or before November 1, 2014, and then deposit $1500.00 within each successive month from December, 2014 through seven and one-half (7-1/2) year term or until a total of net $135,000.00 has been fully paid. Excess payment to [Herst] of the $1500.00 base monthly payment is encouraged and as an incentive, if in any one calendar month when any amount over the $1500.00 due is paid . . . such excess will be allowed as an additional 50% credit to the 2014 purchase price. Example $2000.00 ($500.00 in excess of the required $1500.00), if paid in any one calendar month indicates $2,250 would be the credit that month to the obligation of this 2014 Agreement.

(Dckt. #23, at 28). In essence, in an attempt to assist PSI, Herst agreed to forego the collection of the remaining $243,777 due to him from PSI under the 2006 Contract in exchange for Newman's promise to pay him $135,000 under the terms of the 2014 Agreement. (Dckt. #23, at 2).

The 2014 Agreement also provided Herst with the added security of being named as a beneficiary under Newman's term life insurance policy:

> [Newman] states a ten year Term Life Policy is now in force and has affirmed his responsibility of continuing paying for same on or before each policy payment due date through the 90 month term of this 2014 Agreement. [Newman] has agreed to provide timely written confirmation of each such payment to [Herst]. This [is] to assure continuity.

> [Herst] and/or his Estate and/or his heirs is to be named as primary beneficiary of such Term Life Policy, with the obligation in event of [Newman]'s death, to remit excess proceeds of any unpaid portion of this agreement to any individual(s) as [Newman] has indicated, or later changed by [Newman]'s written notice to [Herst]. [Herst] does not object to [Newman]'s reduction of the face value of any such life policy to coverage value no less than monies as may later be due under this 2014 Agreement. [Newman] is specifically prohibited to allow lapse of an existing policy as required until insurance carrier confirms in writing to [Herst] that lesser coverage is in fact first issued. It is specifically understood that any Lapse of [Newman]'s Life Insurance policy as required herein voids this 2014 Agreement.

(Dckt. #23, at 28). Finally, the 2014 Agreement provides that "[d]efault of any provision of this 2014 Variation fully restores 9/30/06 AGREEMENT." (*Id.*)

## D.     Newman's Payments to Herst Under the 2014 Agreement

A second payment ledger prepared by Newman in February 2017 shows that Newman initially met his obligations under the 2014 Agreement by paying Herst $1,500 a month from

October 2014 through the end of March 2015. (Dckt. #23, at 31).[10] In April 2015, however, Newman paid $1,000 instead of the required $1,500. (*Id.*). Several subsequent underpayments by Newman ensued: $1,000 in April, $500 in May, $1000 in June, $750 in July, and no payment in August. (*Id.*). Newman acknowledged his deficient payments in a July 14, 2015 email to Herst, while at the same time expressing optimism that he could move forward with future payments by early September: "There is hope, there is money coming, it is just a matter of timing." (Dckt. #23, at 33).

Herst responded to Newman on August 14, 2015 with an e-mail stating:

Steve: I appreciate hearing of your confidence in what you expect will be your ability to catch up on payments due me re the 2014 Agreement. I've indicated a willingness to 'sit-out' your request that I be patient. All this is disturbing, in that I'm continually missing the opportunities available to me from moneys owed me by you, yet not being delivered.

This is not to be construed as a self-serving letter. I retain my right to void the 2014 Agreement, returning to the 2006 Agreement, and its greater benefits available to me. The 2014 Agreement, basically designed by you, provided you a settlement, saving you 55% of the principal balance due of the 2006 Agreement. I saw the 2014 Agreement as a chance to generate funds for me in my now obvious limited lifetime, funds that seemed otherwise out of reach. It was for me, a viable compromise, in that almost nine years have passed without substantial debt service being met by you.

My right to void the 2014 Agreement is evident, yet would create chaos for us both. Your affirmation restating your expected ability and desire to fulfill the 2014 Agreement is encouraging. It was agreed we will examine status on September 10 and again on October 20, 2015. Then, if you are not current, it would be my expectation of providing a revised payment process, one that would enable an easier way for you to keep your obligation current.

I am able at this juncture to deliver such revised payment process, but allowing for your statement that you'd be current by September or certainly in early October, I'd prefer you meet that objective first.

---

[10] Ms. Newman objects to this Court's consideration of the February 2017 payment ledger on the grounds that it is not properly authenticated and lacks proper foundation. As he did with respect to the August 2014 payment ledger, however, this Court finds that Herst has made a prima facie showing that the February 2017 ledger is genuine and authentic by providing his sworn affidavit identifying the author of the document (typewritten by Newman with handwritten notations provided by Herst), its time of receipt by Herst, and the meaning of its contents. (Dckt. #23, at 30); Fed.R.Evid. 901(b)(1); *Fluker,* 698 F.3d at 999.

Re the portion herein, indicating your reaffirmation of the current debt coupled with your sense of confidence in your desire to maintain for you the viability of Performance Source Inc, I ask your written ratification validating these commitments as described.

I see this request, and its acceptance by you, as being fair, thus sustaining my acceptance of the anticipated reality of your declared position.

Kindly reaffirm your awareness and acceptance of these points, doing so by response and return of this e-mail indicating your agreement to the points stated.

(Dckt. #23, at 34). Newman responded to Herst later that afternoon of August 14, 2015 stating: "Yes. I am supremely confident that you will be brought up to date in the September to Oct 10th period if not before." (Dckt. #23, at 35).

The February 2017 payment ledger shows that Newman, in fact, caught up on his deficient August through July 2015 installment payments by September 2015. (Dckt. #23, at 31). In particular, the February 2017 ledger shows that Newman's underpayments from April 2015 through July 2015 amounted to $2,750. (*Id.*). Newman paid nothing in August 2015. (*Id.*). In September 2015, Newman paid $4,250, of which $1,500 was allocated to the missed August installment payment and the Court presumes - - reading the evidence in the light most favorable to Ms. Newman - - that the remaining amount ($2,750) was allocated towards the April through July deficiency. (*Id.*). Newman attributed his October 27, 2015 payment of $1,500 to September. (*Id.*).

Newman made additional installment payments to Herst beginning on October 31, 2015 but he once more fell behind schedule in mid-2016. (*Id.*). On September 17, 2016, Herst was concerned that Newman might become disabled and he wrote a letter to Newman's insurance agent (Rick Kantor) regarding the possibility of purchasing a $150,000 disability policy to protect

himself in the event that Newman became disabled. (Dckt. #23, at 3, 32).[11] In his letter, Herst explained that:

> My insurable interest is due to two existing Agreements where Newman, at this date, has a primary Liability due to a November, 2014 Agreement [under] which currently I am owed $106,500.00 payable $1,500.00 monthly. Copy of the 2014 AGREEMENT is enclosed.
>
> He has a contingent variable Liability as of this date of $182,305.00, this due if certain provision of the 2014 AGREEMENT defaults.

(Dckt. #23, at 32). Newman made installment payments through May 25, 2017 and he owed Herst $93,000 under the 2014 Agreement as of the end of May 2017 as Herst confirmed at his deposition. (Dckt. #23, at 31;[12] Dckt. #64-2, at 39). Herst does not recall sending Newman a written notice stating that the 2014 Agreement was defaulted. (Dckt. #64-1, at 7).

Newman died on June 10, 2017. (Dckt. #1, at 3; Dckt. #23, at 3). PSI went out of business one month later on July 10, 2017. (Dckt. #64-2, at 5).

**E.     The Estate's and Ms. Newman's Competing Claims to the Proceeds of the Prudential Life Insurance Policy**

On September 15, 2015, Prudential issued a $300,000 individual life insurance policy to Newman. (Dckt. #17, at 2).[13] Newman designated Ms. Newman as the sole beneficiary to the

---

[11] Notwithstanding Ms. Newman's objection, the Court finds that the Estate has established a foundation and properly authenticated Herst's letter to Kantor by attaching Herst's affidavit, which identifies the letter, its author (Herst), and the meaning of its contents. (Dckt. #23, at 3); Fed.R.Evid. 901(b)(1); *Fluker,* 698 F.3d at 999.

[12] Herst stated in his affidavit that he made the handwritten entries documenting Newman's last three installment payments (Dckt. #23, at 3).

[13] Although neither party attached their answers to Prudential's complaint to their summary judgment submissions, this Court has the right to take notice of its own files and records and it is not required to "turn a blind eye" to the facts available therein. *See Root Consulting, Inc. v. Insull,* No. 14-CV-4381, 2018 WL 1695369, at *1 (N.D.Ill. Apr. 6, 2018); *Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1277 (5th Cir. 1978) ("The District Court clearly had the right to take notice of its own files and records and it had no duty to grind the same corn a second time") (internal quotation marks omitted); *Colonial Penn Ins. Co. v. Coil,* 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records") (internal quotation marks omitted).

policy's death benefits on October 26, 2015. (*Id*.). On December 7, 2015, Newman collaterally assigned the policy benefits to Herst by executing a "Request for Collateral Assignment/Discharge of Assignment" form. (*Id.*; Dckt. #1-2, at 2). In this collateral assignment form, Newman stated: "I assign to the collateral assignee named in the Assignee Information section, a collateral interest in the policy(ies) indicated in the About Your Policy section, as its (his or her) interest may appear, subject to the provisions of the policy and to any indebtedness that may exist." (Dckt. #1-2, at 2).

By life insurance death benefits claim form dated June 12, 2017, Herst submitted a claim to Prudential for $267,541 of the policy's death benefits. (Dckt. #18, at 4). By life insurance claim form dated July 7, 2017, Ms. Newman submitted a claim to Prudential for the entirety of the policy's death benefits. (Dckt. #17, at 3). Faced with the parties' competing claims to the policy's death benefits, Prudential filed its interpleader complaint in this action on December 4, 2017 (Dckt. #1).

## III.   DISCUSSION

The Estate takes the position that both Newman and PSI were in debt to Herst at the time Newman died. (*See* Dckt. #20, at 2-5). In particular, the Estate asserts that Newman was in default under the 2014 Agreement on the date of his death because he failed to make the monthly payments that the Agreement required. (*Id.*). Since Newman was in default, paragraph five of the 2014 Agreement provided that the 2006 Contract was "fully restore[d]." (*Id.*). According to the Estate, the restoration of 2006 Contract "did not cancel the 2014 Agreement." (*Id.*, at 4-5). Consequently, Herst was a creditor of both Newman (for his remaining debt under the 2014 Agreement) and PSI (for its remaining debt under the 2006 Contract) at the time that Newman died with PSI's debt being greater than Newman's debt. (*Id.*, at 2). The Estate further asserts it is entitled to recover at least $267,541 from the proceeds of Newman's Prudential policy.

For her part, Ms. Newman does not dispute that Herst was owed $93,000[14] but she denies that Newman was ever in "default" under the terms of the 2014 Agreement. Consequently, according to Ms. Newman, the 2006 Contract was never restored. Ms. Newman further denies that the terms of Newman's collateral assignment to Herst allowed for Herst to be paid for the debt owed to him by PSI from the Prudential policy proceeds.

## A.    The Estate's Right To Recovery Is Limited To The Amount Of The Debt Newman Owed To Herst At The Time Of His Death

The Estate's right to recovery of the policy proceeds is determined by the terms of the collateral assignment that Newman made to Herst: in particular, the Estate's recovery is limited to "any indebtedness that may exist" between Newman and Herst at the time of Newman's death. *See Luxton v. United States,* 340 F.3d 659, 662 (8th Cir. 2003) ("Unlike an absolute assignment, which permanently transfers all rights in the policy to the assignee, a collateral assignment transfers only those rights necessary to secure the assignor's debt and extinguishes the named beneficiary's interest only to the extent of the assignor's debt to the assignee"); *Scheffer v. Centier Bank,* 101 N.E.3D 815, 824 (Ind.Ct.App. 2018) ("When an insured assigns an insurance policy, the beneficiary is not divested of his or her general interest in the proceeds, but instead a lien is created in favor of the assignee to the extent of the debt owed"). Ms. Newman, the beneficiary under the policy, is entitled to recover the remaining amount of the insurance proceeds after the debt to Herst has been paid. *See Matter of Nelson,* No. 13-00801-ALS7, 2015

---

[14] In her Rule 56.1(b)(3)(c) statement of additional facts, Ms. Newman asserts that "as of July 2017, Herst acknowledged the balance due to him **from PSI** was $93,000." (Dckt. #64-1, at 7) (emphasis added). The Court does not deem this fact admitted because it is not supported by the cited reference to Herst's deposition. On the deposition page in question, Herst testified that he was due $93,000 under the 2014 Agreement. (Dckt. #64-2, at 39). As Ms. Newman has asserted, only Herst and Newman were parties to the 2014 Agreement and one of the purposes of the Agreement was to substitute Newman for PSI as the debtor to Herst. Consequently, only Newman and not PSI had liability to Herst under the 2014 Agreement.

WL 1367410, at *2 (Bankr.S.D. Iowa Sept. 14, 2015) ("Under an assignment of collateral the policy proceeds are first used to pay the amounts due to the assignee with any remaining balance being paid to the beneficiary named in the policy").

Ms. Newman admits in her answer to Prudential's complaint in interpleader that "she is aware of an agreement between Defendant Herst and Steve Newman wherein a limited amount of debt was intended to be secured by the proceeds of the insurance policy." (Dckt. #17, at 2). The parties have identified the 2014 Agreement and the 2006 Contract as the potential sources of the debt that that Newman owed to Herst at the time of his death.

**B.    Newman Owed Herst A Debt Under the 2014 Agreement At The Time Of His Death**

**1.    The 2014 Agreement Was A Valid Modification Of The 2006 Contract**

The Estate asserts that the 2014 Agreement did not supersede the 2006 Contract but instead modified it by "amend[ing] two terms only, the purchase price and the payment schedule." (Dckt. #20, at 4). The Court agrees. Contracts can be modified where - - as here - - all of the criteria necessary for a valid contract are satisfied, including offer, acceptance, and consideration. *Int. Bus. Lists, Inc. v. Am. Tel. & Tel. Co*., 147 F.3d 636, 641 (7th Cir. 1998) (citing Illinois cases).  As explained above in Section II(C), Herst agreed to reduce the remaining amount owed for the purchase of PSI and extend the term during which payments would be made to him in exchange for a more consistent stream of income from Newman's payments and Newman's agreement to name him as a beneficiary under Newman's life insurance policy to the extent of any debt that Newman owed him at the time of Newman's death.  Herst and Newman executed the 2014 Agreement and performed it between October 3, 2014 and Newman's death in June 2017.

## 2. Ms. Newman's Attempt To Challenge The Enforceability Of The 2014 Agreement Fails

Despite the fact that Herst and Newman performed the 2014 Agreement for over two and one half years, Ms. Newman asserts for three reasons that there are issues of material fact that preclude summary judgment on the question of whether the Agreement created a legally enforceable obligation. (Dckt. #70, at 8-9). In particular, Ms. Newman questions whether the 2014 Agreement can be a proper modification because not all parties who executed the SPA executed the 2014 Agreement. Next, she points to the fact that the 2014 Agreement references the "9/30/2006 Agreement re sale of Performance Source Inc (PSI)" from Herst to Newman in its title even though the 2006 Contract effectuating the sale of PSI was actually executed one day later on October 1, 2006. Finally, she asserts that the 2014 Agreement is "void" because Newman did not have a life insurance policy in place at the time the 2014 Agreement was executed as the terms of the Agreement required. Ms. Newman cites no authority in support of these arguments and they are without merit.

### a. Herst and Newman executed both the SPA and 2014 Agreement and the 2014 Agreement was binding on them at the date that Newman died

Ms. Newman asserts that the 2014 Agreement was not a proper modification because the same parties did not sign both the 2014 Agreement and the SPA. To recap, it is undisputed that Herst and Newman - - the signatories of the 2014 Agreement - - also signed the SPA. (*See* Sections II(A)(i) and II(C), *supra*). However, Herst signed the SPA in two capacities (individually <u>and</u> as President of PSI) whereas he signed the 2014 Agreement in his individual capacity. Moreover, although Newman was indisputably the President of PSI at the time the 2014 Agreement was executed, he likewise signed the 2014 Agreement only in his individual capacity. The SPA provides that it "may not be changed or modified in any manner, except by

an instrument in writing signed on behalf of each of the parties hereto." (Dckt. #23, at 13). Ms. Newman presumably relies on this fact that neither Herst nor Newman signed the 2014 Agreement on behalf of PSI to support her perfunctory, one sentence long argument on this point.

Under Illinois law, "[a] written contract may be modified by the parties thereto in any manner they choose, notwithstanding agreements prohibiting its alteration, except in a particular manner." *Park v. Dealers Transit, Inc.,* 596 F.2d 203, 204 (7th Cir. 1979) (internal quotation marks omitted); *Bell & Howell Fin. Servs. Co. v. St. Louis Pre-Sort, Inc.,* No. 97 C 6063, 1999 WL 35316, at *6 n.8 (N.D.Ill. Jan. 11, 1999) (same); *Cowhey Equipment Co. v. Iveco Trucks of North America,* No. 84 C 6814, 1985 WL 961, at *4 (N.D.Ill. April 25, 1985) (same). Thus, a contract can be validly modified through an oral agreement even if the contract requires a written modification. *Id.* Furthermore, in *Cowhey,* the court held that a modification was valid even though it was not signed by one of the specified corporate officers that the contract required a modification to be signed by. *See Cowhey*, 1985 WL 961, at *3-4. Thus, the fact that the 2014 Agreement was not executed in the precise manner called for by the SPA is not dispositive of the question of whether it was a legally binding modification.

Furthermore, there is support in Illinois law for the proposition that all three parties to the SPA are bound by the 2014 Agreement even though no one executed the Agreement on behalf of PSI. The Illinois Appellate Court's decision in *Crest Hill Land Development, LLC v. Conrad,* 2019 IL App (3d) 180213, is instructive.[15] In *Crest Hill,* two individuals (Conrad and Konopka)

---

[15] The *Crest Hill* decision concerned a contract novation and not a modification. While the Court agrees with the Estate's argument that the 2014 Agreement is not a novation because the liability that PSI incurred to Herst under the 2006 Contract was not *unconditionally* extinguished, *see U.S. Fidelity and Guaranty Co. v. Klein Corp.,* 190 Ill.App.3d 250, 256 (1st Dist. 1989), this is an immaterial distinction for purposes of determining whether all parties including PSI are bound by the 2014 Agreement.

entered into a valid contract. 2019 IL App (3d) 180213, at ¶36. Before the contract was fully performed, Conrad and Konopka (signing as the manager of a company known as CHLD) entered into a valid subsequent agreement which substituted CHLD for Konopka as the debtor. *Id.* Notwithstanding the fact that Konopka did not sign the subsequent agreement in his individual capacity, the Illinois Appellate Court held that this agreement was a binding novation validly agreed to "by all three of the parties involved – Conrad as the creditor, Konopka (implicitly) as the initial debtor, and CHLD as the substitute debtor." *Id.*

As in *Crest Hill*, the debtor for the initial agreement in this case (PSI) did not execute the subsequent agreement that was executed by the party who was substituted as the debtor (Newman). Ms. Newman has not asserted that PSI disagreed with the 2014 Agreement or was somehow harmed by it, nor is there any evidence in the record that would permit the Court to draw an inference that PSI opposed or was disadvantaged by the Agreement. To the contrary, the 2014 Agreement was highly favorable to PSI because it relieved PSI of its obligation to make any further payments to Herst so long as Newman fulfilled his obligations under the Agreement. Consequently, consistent with *Crest Hill*, the Court finds that PSI implicitly agreed to and was bound by the 2014 Agreement. Accordingly, the 2014 Agreement was a valid modification that was binding on all three parties to the SPA.

Finally, even if the 2014 Agreement were not binding on PSI because no one signed the Agreement on PSI's behalf, authority from multiple jurisdictions around the county establishes "that two parties to a tripartite agreement may modify the original agreement, provided such modification in no way prejudices the interests of the third, non-consenting party." *600 N. Frederick Rd., LLC v. Burlington Coat Factory of Maryland, LLC,* 419 Md. 413, 440, 19 A.3d 837, 853-54 (2011) (citing cases); *Hotle v. Miller,* 51 Cal.2d 541, 547 (1959); *Lakeshore*

*Commercial Fin. Corp. v. Drobac,* 107 Wis.2d 445, 458-59, 319 N.W.2d 839, 845-46 (1982).

As the Wisconsin Supreme Court stated in *Lakeshore*:

> Because parties have entered into a contractual arrangement does not eliminate their continuing right under the law to contract with each other. The only limitation is that they cannot contract with each other by way of modification in a manner that affects the rights of an original contracting party who is prejudiced by the new agreement and has not assented to it.

*Lakeshore,* 107 Wis.2d at 458, 319 N.W.2d at 845. This authority is persuasive.

The Court is also mindful of Ms. Newman's admission in her answer that there is an agreement between Herst and Newman wherein a limited amount of debt was to be secured by the proceeds of Newman's insurance policy. (Dckt. #17, at 2). This was a judicial admission that Ms. Newman cannot contradict[16] and the 2014 Agreement is the only agreement in the record that she could have possibly been referring to because it is undisputed that Newman had no personal liability to Herst under the 2006 Contract at the time of his death. For these reasons, the Court finds that the 2014 Agreement is binding on Herst and Newman notwithstanding the fact that PSI did not expressly assent to it because the Agreement "in no way prejudices the interests" of PSI.

**b.      The mistaken date within the title of the 2014 Agreement is a scrivener's error that does not create a genuine issue of material fact**

Ms. Newman - - who again cites no authority in support of her position - - asserts that the 2014 Agreement's title's reference to a "9/30/06" Agreement for the sale of PSI from Hearst to Newman raises a genuine issue of material fact because the 2006 Contract effectuating the sale was actually executed on October 1, 2006, there is no 9/30/06 agreement between Newman and

---

[16]It is a "well-settled rule that a party is bound by what it states in its pleadings. 'Judicial admissions are formal concessions in pleadings . . . that are binding upon the party making them.'" *Soo Line R. Co. v. St. Louis Sw. Ry. Co.,* 125 F.3d 481, 483 (7th Cir. 1997), *quoting Keller v. United States,* 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).

Herst, and "there has been no evidence or testimony provided by the parties who made the mistake to suggest it was a mistake." (Dckt. #70, at 8). The Estate counters by asserting that the mistaken date is an "insignificant error" and it points to testimony from Herst's deposition where he testified that the 9/30/06 date was a "dating mistake." (Dckt. #65, at 6).

The Estate has the better part of this argument. During Herst's deposition, Newman's counsel showed Herst the 2014 Agreement and asked him what the "9-30-2006 agreement" was. (Dckt. #64-2, at 101-02). Herst repeatedly testified that the "9-30-2006 agreement" was the "purchase agreement" notwithstanding the fact that it was dated "9-30-2006" instead of 10-1-2006 when the purchase was actually effectuated. (Dckt. #64-2, at 102-03). The record further shows that there was only one sale of PSI from Herst to Newman. Consequently, there is no possibility that the 2014 Agreement was referring to any sale of PSI other than the one that took place on October 1, 2006 notwithstanding the Agreement's reference to 9/30/06.

Illinois courts have repeatedly found similar mistakes regarding dates to be immaterial "scrivener's errors." *See, e.g., In re Marriage of Crecos,* 2015 IL App (1st) 132756, ¶17 ("we find that Diana made two scrivener's errors when she typed the incorrect dates of July 27, 2013 and September 24, 2013, when she should have referenced the September 24, 2012 and July 26, 2013 orders in her notice of appeal" and holding that the "scrivener's errors . . . do not create a fatal defect"); *In re: Detention of Kelley,* 2019 IL App (1st) 162184, ¶¶48-49 (holding that reference to "June 6, 2016" instead of "June 6, 2017" on a notice of appeal to be a "scrivener's error" that did not "create a fatal defect"); *People v. Wyzgowski,* 323 Ill.App.3d 604, 605-07, 752 N.E.2d 1253, 1254-56 (3d Dist. 2001) (holding that officer's report that incorrectly stated the date of arrest as July 7, 2000 rather than the actual date of July 6, 2000 contained a "scrivener's error" that did not "affect the validity of the report").

Such "scrivener's errors" do not create genuine issues of material fact that are sufficient to preclude summary judgment. *See, e.g., United States v. Romero,* No. 15 C 5607, 2017 WL 61025, at *1 n.2 (N.D.Ill. Jan. 5, 2017) (holding that "scrivener's errors" did not create genuine factual disputes on summary judgment); *Buchanan v. McCann,* No. 08-CV-7063, 2011 WL 4837279, at *1 n.3 (N.D.Ill. Oct. 12, 2011) (holding that "typographical error" in statement of material facts that referred to an incident as occurring on August 18, 2008 instead of August 15, 2008 when the incident actually occurred did not create a genuine factual dispute); *see also Oto v. Metropolitan Life Ins. Co.,* 224 F.3d 601, 605-06 (7th Cir. 2000) ("Beverley argues that this one misstatement or typographical error is enough to preclude summary judgment. We disagree and see it for what it is, either a misstatement or typographical error"). Ms. Newman cites no authority to the contrary and this Court finds that the mistaken date in the title of the 2014 Agreement is a scrivener's error that does not raise a genuine issue of material fact sufficient to preclude summary judgment.

      c.    **The fact that Newman obtained the Prudential insurance policy after the 2014 Agreement was executed does not raise any genuine issues of material fact as to whether the Agreement is enforceable**

Ms. Newman asserts that there are disputed issues of fact that arise from the fact that Newman did not have a life insurance policy in place at the time the 2014 Agreement was executed as the Agreement required but instead obtained the Prudential life insurance policy in September 2015. (Dckt. #70, at 9). Once more, Ms. Newman cites no authority in support of her assertions and they are without merit.

First, Ms. Newman contends that Newman's failure to have a life insurance policy when the 2014 Agreement was executed rendered the Agreement "void" and raises a question as to whether any of its provisions are enforceable. This argument is wrong as a matter of law given

the undisputed facts here.  Contracts are void under Illinois law only if the subject matter of the contract is illegal (*Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.,* 355 Ill.App.3d 156, 164, 821 N.E.2d 706, 712-13 (1st Dist. 2004)), one of the contracting parties exceeded its authority in executing the contract (*Id.*), or there was "fraud in the execution" - - which "entails deceiving a party to an agreement as to the very nature of the instrument it signs so that the party actually does not know what he is signing, or does not intend to enter a contract at all."  *In re Settlers' Hous. Serv., Inc.,* 586 B.R. 40, 65 (Bankr.N.D.Ill. 2017) (internal quotation marks omitted).  None of these circumstances are present here and the 2014 Agreement is not void.

At worst, Newman's execution of the 2014 Agreement without having a life insurance policy as he promised was fraud in the inducement - - which would have "render[ed] the contract voidable at the election of the innocent obligor."  *Tower Inv'rs, LLC v. 111 E. Chestnut Consultants, Inc.,* 371 Ill.App.3d 1019, 1030, 864 N.E.2d 927, 939 (1st Dist. 2007); *Faust Printing, Inc. v. MAN Capital Corp.,* No. 02 C 9345, 2007 WL 4442325, at *6 (N.D.Ill. Dec. 14, 2007).   Thus, the option of treating the 2014 Agreement as voidable was available only to Herst (the innocent obligor) and not to Newman.  Herst and the Estate have never sought to treat the 2014 Agreement as voidable notwithstanding Newman's purported deceit.  (*See* Dckt. #65, at 7).

Ms. Newman also asserts that there is a question of fact as to whether Newman purchased the Prudential insurance policy to satisfy his obligation under the 2014 Agreement or for his own estate planning purposes.  The Court disagrees.  If Newman had purchased the Prudential policy for his own estate planning purposes, there would have been no reason for him to issue the collateral assignment to Herst.  In any event, it does not matter why Newman purchased the policy.  Newman collaterally assigned the policy proceeds to Herst to the extent of his debt to Herst without any restriction as to the source of the debt.  The only thing that matters is whether

there was a legally enforceable debt owed from Newman to Herst at the time of Newman's death. As found above, the 2014 Agreement was legally enforceable and binding on Herst and Newman and, as addressed immediately below, Newman owed a debt to Herst under the 2014 Agreement at the time of his death.

### d.    It is undisputed that Newman owed Herst $93,000 under the 2014 Agreement at the time of Newman's death

As set forth above in Section II(D), the undisputed facts establish and the Estate admitted in its reply brief that Newman owed Herst a balance of $93,000 under the 2014 Agreement at the time of his death. (Dckt. #23, at 31; Dckt. #64-2, at 39; Dckt. #65, at 8). Consequently, pursuant to the terms of the collateral assignment, the Estate is entitled to recover $93,000 of the insurance proceeds plus accumulated interest based upon the debt that Newman owed Herst under the 2014 Agreement at the time of his death.

### C.    The Estate is not entitled to recover the remaining debt it claims that PSI owed to Herst under the 2006 Contract from the proceeds of Newman's life insurance policy

In addition to seeking to recover the debt that Newman owed Herst under the 2014 Agreement, the Estate also seeks to recover from the insurance proceeds the amount that it claims PSI owed Herst under the 2006 Contract at the time of Newman's death. The Estate makes a two-pronged argument in support of its position. First, it asserts that Newman was in "default" under the 2014 Agreement based on his failure to timely make the required monthly payments to Herst and that the default "fully restore[d]" the 2006 Contract. Second, the Estate asserts that the collateral assignment issued by Newman to Herst in connection with the Prudential policy encompassed the remaining debt that PSI owed to Herst under the 2006 Contract.[17] For the reasons explained below, the Estate is wrong on both counts.

---

[17] Herst admitted in his deposition that Newman paid the $1,000 that he owed to Herst under the 2006 Contract when the deal closed in October 2006. (Dckt. 64-2, at 11.)

1.    **The meaning of "default" as used in the 2014 Agreement is determined with reference to how "default" is defined by the 2006 Contract**

The parties dispute the meaning of the term "default" as it is used in the 2014 Agreement. The Estate argues that Newman was not entitled to notice for any default under the 2014 Agreement because the 2014 Agreement did not include a notice provision and that a reversion to the terms the 2006 Contract was "automatic" upon default. (Dckt. #19, at 3). Ms. Newman argues that the meaning of the term "default" in not defined in the 2014 Agreement and that the meaning of the term must be determined with reference to how the term is defined within the 2006 Contract. Under the 2006 Contract, a "default" does not occur unless written notice of a failure to perform is first delivered in the contractually-specified manner and the non-performing party fails to cure within 30 days.[18] This Court must determine the meaning of the parties' contracts as a matter of law so long as the contracts are not ambiguous. *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 565 (7th Cir. 1995).

As the Estate has argued and the Court has found, the 2014 Agreement was a modification of the 2006 Contract. Under Illinois law, a contract that modifies a prior agreement must be read in conjunction with the first contract in order to determine the rights and obligations of the parties. *See Downers Grove Assoc. v. Red Robin Intern., Inc*., 151 Ill.App.3d 310, 318, 502 N.E.2d 1053, 1060 (1st Dist. 1986). When it is clear that the parties intend to alter a limited number of terms of their original contract, the new contract serves as a supplement to the first agreement that incorporates, rather than replaces, those terms of the first contract that are consistent with the those of the second contract. *Joyce v. DLA Piper Rudnick Gray Cary LLP,*

---

[18] Three of the component parts of the 2006 Contract (namely, the Note, CSA, and PSA) each have default and notice provisions that share the above characteristics but have some minor variations that are not material for purposes of this motion. *Supra,* at Section II(A)(ii) (the Note), Section II(A)(iii) (the CSA), and Section II(A)(iv) (the PSA).

382 Ill.App.3d 632, 637, 888 N.E.2d 657, 662 (1st Dist. 2008) ("a contract modified by the parties creates a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed") (internal quotation marks omitted); *Large v. Mobile Tool Intern., Inc.*, 724 F.3d 766, 772 (7th Cir. 2013) ("Parties are free to abrogate, change, modify, or substitute a primary contract with their mutual assent; in such a case, the original contract will remain in force, except to the extent modified by any new agreement"). "A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Schwinder v. Austin Bank of Chicago*, 348 Ill.App.3d 461, 469, 809 N.E.2d 180, 189 (1st Dist. 2005).

As the Estate notes, "the title of the 2014 Agreement unequivocally sets out the parties' intent: '2014 Agreement for the Variation of purchase price of 9/30/06 Agreement' . . . [and] [t]he parties wanted to amend two terms only, the purchase price and the payment schedule". (Dckt. #20, at 4.)[19] As such, all provisions of the 2006 Contract that do not address the purchase price and payment schedule remained in place. This includes the manner in which the term "default" is defined in the 2006 Contract because the 2014 Agreement does not define the meaning of "default" as it is used therein. Moreover, the fact that the 2014 Agreement does not address notice does not mean that the parties agreed to eliminate the notice requirement. As stated above, a second contract only modifies earlier terms that are *inconsistent* with the language of the new contract. Since nothing in the 2014 Agreement is inconsistent with the notice provisions that the parties agreed to in 2006, Herst remains bound by those provisions.

---

[19] It is also true that the 2014 Amendment contained provisions that required Newman to purchase a life insurance policy and concerned tax-related matters. These provisions constitute new agreements between Herst and Newman because they are not inconsistent with any provisions within the 2006 Contract.

2.     **The Estate has failed to establish that a default occurred under the 2014 Agreement**

Consistent with the manner in which "default" is defined in the 2006 Contract, the Estate must show that Herst provided Newman with written notice of a failure to perform and a thirty-day opportunity to cure and that Newman failed to cure to establish a "default" under the 2014 Agreement.   The undisputed facts on this record (set forth above in Section II(D) with citations) show that the Estate has failed to establish that Newman defaulted on the 2014 Agreement.

To recap, Newman met his payment obligations under the 2014 Agreement between October 2014 and March 2015.  In April 2015, Newman made a payment below the required level and he continued that pattern through August 2015.  In response to a communication by Herst,[20] Newman wrote Herst in a July 14, 2015 e-mail in which he admitted that he was behind in payments and expressed optimism that he would get back on track by September.  On August 14, 2015, Herst responded with an e-mail in which he expressly reserved his right to void the 2014 Agreement and return to the 2006 Contract but stated that taking that step "would create chaos for us both" and he granted Newman an opportunity to catch up with his payments by September or early October, 2015.

Newman, in fact, caught up on his payments by September 2015 and he remained current through mid-2016.  There is no evidence in the record that Herst provided Newman with any sort

---

[20] It is unclear how (or when) Herst communicated with Newman regarding his failure to keep up with the payment schedule prior to mid-July 2015 and the Estate acknowledges that Herst did not provide Newman with notice in the manner specified by the 2006 Contract.  (Dckt. #65, at 4).  Nonetheless, it is clear from Newman's July 15 e-mail that Herst had previously informed Newman that he was behind on the payment schedule.  (Dckt. #23, at 33 ("You are right in everything you said. . . .Yes, I am behind.  Will I catch up, absolutely. No question")).  Under Illinois law, "[a] contracting party's technical non-compliance with the precise requirements of a notice provision does not preclude that party from enforcing its rights under the contract if the intended recipient received actual notice, because the non-compliance is not a material breach of contract by the party providing notice." *Duncan Donuts, Inc. v. Towns Family, Inc.,* 1995 WL 591454, at *4 (N.D.Ill. Oct. 4, 1995).

of additional notice concerning Newman's failure to keep up with the payment schedule and stating Herst's intent to void the 2014 Agreement if Newman did not become current with his payments. In fact, Herst does not recall ever sending a written notice letter to Newman stating that the 2014 Agreement was defaulted. However, Herst did write a September 17, 2016 letter to Newman's insurance agent in which he stated that Newman would have "a contingent variable liability as of this date of $182,305.00, this due *if certain provision of the 2014 AGREEMENT defaults.*" (Dckt. #23, at 32 (emphasis added)). This reflects a clear admission by Herst that the 2014 Agreement had not defaulted as of that date. Herst also continued to accept Newman's payments through May 25, 2017 (just days before Newman died).

Under Illinois law, "time of payment may be declared of the essence" by contracting parties and the party due payment may be granted the right to terminate the agreement based upon late payments. *Lang v. Parks,* 19 Ill.2d 223, 226, 166 N.E.2d 10, 12 (1960). However, the party's right to terminate the agreement "may be temporarily abrogated by his regular acceptance of prior payments at irregular intervals." *Id.* "When this has occurred, [the party] is prevented from treating a tardy payment as ground for forfeiture until he has first given [the other party] reasonable notice of his intention to thereafter demand strict compliance with the terms of the agreement." *Id.*

The *Lang* decision represents a long-standing rule of Illinois law. *See, e.g., Brown v. Jurczak,* 397 Ill. 532, 542, 74 N.E.2d 821, 826 (1947) ("A default in payment is required to be followed by some act of the vendor indicating his election to consider the contract at an end before it will be terminated"); *American Nat. Bank & Trust Co v. Dominick,* 154 Ill.App.3d 275, 281, 507 N.E.2d 512, 515-16 (1st Dist. 1987) ("failure to declare a forfeiture at the time of noncompliance is a waiver and a forfeiture cannot be declared until the defaulting party is given

reasonable notice of nonbreaching party's intent to demand strict compliance in the future . . . . a party may not lull another into loose compliance with the terms of a contract and later claim imperfect compliance as a breach") (citing cases); *Kirkpatrick v. Petreikis,* 44 Ill.App.3d 575, 577, 358 N.E.2d 679, 680-81 (3d Dist. 1976) ("Since it would be an unjust result to allow the seller to declare a forfeiture on the failure of the buyer to pay an installment after the seller has accepted payments after the fixed dates, the time of the essence clause must be revived by giving the buyer a warning notice that strict compliance with the contract will be insisted on in the future and that forfeiture will be declared if the payments are not promptly made") (internal quotation marks omitted).

In this case, the undisputed facts show that Herst tolerated Newman's less than perfect compliance with the 2014 Agreement's payment schedule after mid-2016 without providing Newman with notice that he would seek to declare a default if Newman did not cure and come into compliance. Moreover, there is no evidence that Herst ever declared that the 2014 Agreement was in default and that he considered the 2006 Contract to be restored. Consequently, the Court finds based on this record that Herst has failed to establish a "default" within the meaning of the 2014 Agreement. Accordingly, the 2006 Contract was never restored before Newman's death and there is no basis for the Estate to recover from the Prudential policy proceeds the remaining debt that PSI owed to Herst under the Contract.

### 3. Even if the 2006 Contract had been restored prior to Newman's death, the Estate cannot collect PSI's debt to Herst under Herst's collateral assignment

Even if Herst had taken effective action to restore the 2006 Contract prior to Newman's death, the collateral assignment that Newman issued to Herst would not have provided the Estate with a basis to collect the debt that PSI owed to Herst from the Prudential policy proceeds. There are several reasons for this.

31

First, the text of the 2014 Agreement indicates that Herst and Newman intended for the life insurance policy procured in connection with that Agreement to provide coverage for Newman's debt under that Agreement. In particular, the 2014 Agreement states that Herst did not object to Newman's "reduction of the face value of any such life policy to a coverage value no less than monies as may later be due under this 2014 Agreement." (Dckt. #23, at 28). If the parties had intended - - as the Estate now claims - - for this policy to provide payment for what Newman owed Herst under the 2014 Agreement *and* what PSI owed Herst under the 2006 Contract, they never would have included the above provision.

Second, Newman procured the Prudential policy himself and the policy documents make no mention of PSI aside from identifying it as Newman's employer. (Dckt. #1-1, at 2). Herst testified that he understood the difference between Newman obtaining his own life insurance and PSI obtaining life insurance on Newman when commercially practicable as required by the 2006 Contract. (Dckt. #64-2, at 29). There is no basis in law to construe the collateral assignment that Newman issued to Herst as subjecting the policy proceeds to "any indebtedness that may exist" for any person other than Newman. Indeed, the collateral assignment would have to be construed as covering "any indebtedness that may exist" for Newman *and* his stated employer (PSI). Courts "will not place [such] an illogical and ridiculous construction" upon contractual language. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 256 Ill.App.3d 31, 37, 628 N.E.2d 1165, 1170 (1st Dist. 1993); *see also Westfield Ins. Co. v. Vandenberg,* 796 F.3d 773, 777 (7th Cir. 2015) (Under Illinois law, an insurance policy is a contract and the general rules of contract interpretation govern their interpretation).

Third, PSI's debt to Herst was not part of Newman's debt to Herst even though Newman was PSI's President and sole shareholder at the time he died. This is so because "a corporation

as a legal entity exists separately from its shareholder, directors and officers, who are not ordinarily liable for the corporation's obligations." *Cosgrove Distributors, Inc. v. Haff,* 343 Ill.App.3d 426, 428-29, 798 N.E.2d 139, 141 (3d Dist. 2003); *Peetoom v. Swanson,* 334 Ill.App.3d 523, 526, 778 N.E.2d 291, 294 (2d Dist. 2002) ("Limited liability will ordinarily exist even though the corporation is closely held or has a single shareholder").

In sum: the Estate cannot recover the remaining debt that PSI owed Herst under the 2006 Contract from the Prudential policy proceeds pursuant to the collateral assignment that Herst received from Newman.

## IV.  **CONCLUSION**

For all these reasons, defendant James Herst's motion for partial summary judgment [22] is granted in part and denied in part.  The Estate is entitled to $93,000 of the principal amount of $300,000.  Defendant Ms. Newman is entitled to the remaining principal of $207,000.  The parties are to receive prejudgment interest on an equivalent *pro rata* basis, with 31 percent of the available interest going to the Estate and 69 percent going to Ms. Newman.

ENTER:

_____
Hon. Jeffrey Cummings
United States Magistrate Judge

DATE:  September 30, 2019